## TOLEDO, ST. LOUIS & WESTERN RAILROAD COMPANY v. BOND.

[No. 4,970. Filed December 7, 1904. Rehearing denied February 1, 1905. Transfer denied March 17, 1905.]

1. PLEADING.—*Complaint.*—*Master and Servant.*—*Railroads.*—*Failure to Maintain Signal-Light at Switch.*—A complaint, alleging that the defendant railroad company failed to provide its switching appliance, on a switch connected with its main track, with a signal-light and by reason thereof the plaintiff, a brakeman, was injured, states a cause of action under the act of 1901 (Acts 1901, p. 160, §5173a et seq. Burns 1901), requiring that every railroad company shall maintain a signal-light upon each switch connected with the main track and for failure thereof shall be liable to all persons and employes injured thereby. p. 147.

2. STATUTES.—*Construction.*—*Railroads.*—*Maintenance of Signal-Lights at Switches on Main Track.*—The principal track of a "Belt Road" which is maintained by two railroad companies for the purpose of setting in and out freight-cars, and for the transporting of cars from one road to the other, and for the passage of trains, and which has numerous switches connected with it and is operated by a distinct set of employes is the "main track" of a railroad within the meaning of the act of 1901 (Acts 1901, p. 160, §5173a et seq. Burns 1901), requiring that every railroad company shall provide a signal-light upon each switch "connected with the main track." p. 149.

3. SAME.—*Remedial Statute.*—*Construction.*—A remedial statute will be construed liberally to accomplish its evident purpose. p. 152.

From Superior Court of Madison County; *Henry C. Ryan*, Judge.

Action by Luther Bond against the Toledo, St. Louis & Western Railroad Company and another. From a judgment for plaintiff for $4,000, defendant railroad company appeals. *Affirmed.*

*Charles A. Schmettau, A. Braden Clark* and *Clarence Brown,* for appellant.

*Lovett & Slaymaker, J. F. Charles* and *Brownlee & Browne,* for appellee.

BLACK, J.—The action of the appellee was commenced in the Grant Circuit Court, from which there was a change of venue to the court below. The overruling of the appellant's motion for a new trial is assigned as error. In the complaint it was alleged that the appellant (spoken of in the testimony as the Clover Leaf) and the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company (spoken of in the testimony as the Panhandle) owned, controlled, maintained and operated for their mutual benefit in the city of Marion, Grant county, and in the vicinity of that city, a main, steam railway track, and certain switches and side-tracks connected thereto, which main track was commonly known in that vicinity as the Belt Road, and among other purposes was operated by these companies for transferring cars, locomotives and trains from the main or trunk lines of one of them to those of the other; that connected with the Belt Road were two switches or side-tracks, the south one of which was used for the storage of freight-cars and other cars set thereon by the Panhandle, and the north one of which was used for the storage of freight-cars and other cars set thereon by the appellant; that the cars were so set on switches respectively by the employes of the respective companies, known as a yard or switch crew; that on and prior to February 1, 1902, the yard or switch crew of the appellant consisted of five employes—the conductor, the engineer, the fireman, and appellee and another person as brakemen; that there were on the south side-track, so connected with the Belt Road, about fifteen cars of freight, all standing together, on which the brakes were set, so that without releasing the brakes the cars could only be moved by a violent force coming in contact therewith; that the end of this line of cars was within sixty or seventy feet of the point where

the south switch was joined to the main track of the Belt Road; that on that day misting snow was falling, and the day was very dark and cloudy, and objects, unless of large size and very bright, could not be seen at a distance of 150 or 200 feet from an observer, especially by a trainman standing on the top of a train of cars moving at a high rate of speed; that on and prior to that day the south side-track was connected with the main track of the Belt Road by means of a switching device operated by means of a long lever, which lay close to the ground or roadbed of the main track, and connected with the moving panel of the switch, the lever being used to throw the moving panel from the main track to the side-track, and back again, in setting cars on or removing them from the side-track; that when the moving panel was set to the side-track, it would cause the cars on the main track to go on the side-track, and when set to the main track, cars would pass without going on the side-track; that on and prior to that day this switch was not connected with any upright target, or with any signals to designate when the moving panel was set to or from the side-track, nor was there on that day placed or maintained upon this switch, thus connected with the main track, any signal-light attached in such a manner to the moving panel of the switch that it would indicate safety when the switch was set to the main track and danger when it was not set to the main track, nor was any signal-light whatever kept burning at the switch between the hours of sunset and sunrise or on dark or foggy days, and there was no other means of ascertaining how the switch was set, except by the position of the lever, which lay close to the ground, and by the ends of the rails of the moving panel, either of which could be seen only at a very short distance; that on and prior to that day there was no lock on the lever, or any other means of securely fastening the moving panel, but any person passing along the main track could move the panel by turning the lever, thus moving the panel to and from the main track of

the Belt Road; that the appellant on that day, and for a long time prior thereto, had full knowledge of the foregoing facts and of the condition of the switch, but it knowingly, carelessly, negligently and wilfully permitted and allowed the switch, side-track and switching device to be and remain in such unsafe, imperfect and unlawful condition, and knowingly, carelessly, negligently and wilfully failed to provide the switch or side-track, moving panel and switching device with any signal-light, signal, target or other signal whatever, either in the day or night-time; that this switch, side-track and switching device, at the time mentioned, were extremely dangerous and unsafe for the employes of the appellant and other persons riding on cars along the main track at that point; that on the day mentioned the switch or yard crew of the appellant, consisting of the persons before mentioned, were engaged, in part, in transferring and moving cars along the main track of the Belt Road, and, while so engaged, they started at the main or trunk line of the appellant, north on the main track of the Belt Road, with an engine and eight freight-cars, the engine being toward the south and the cars toward the north, the north car being a large refrigerator box-car; that the train, consisting of the engine and eight cars, was at the time and during all that day, in charge of a person named, as conductor thereof, and was run backwards on the main track of the Belt Road, toward the north, at a high and dangerous rate of speed —from fifteen to eighteen miles per hour—and was moving at that speed when it approached and came up to the said south switch; that the appellee at that time was on top of said refrigerator box-car, he being then an employe of the appellant, and being properly at that place in the discharge of his duty as brakeman; that at that time the moving panel of said south switch was so set as to throw cars moving northward on the main track upon the side-track and against the cars which were standing thereon; that appellee

did not and could not see the condition of the switch or the position of the moving panel until the box-car on which he was standing was within a short distance of the switch, to wit, thirty or forty feet; that as soon as he saw the condition of the switch, and that it was set to the side-track, he atempted to signal the conductor or engineer of the train to stop it, but no one responded to the signal; that if such signal had been seen and acted upon it would have been impossible to stop or materially to check the speed of the train before it collided with the cars standing on the side-track; that had the switch, moving panel or side-track been provided with signal-lights attached thereto in such manner as to indicate danger when the switch was not set to the main track, the signal-lights could have been seen in time so that the train could have been stopped, or so checked as to avoid a collision with the cars standing on the side-track; that by reason of the moving panel being set to the side-track, and not to the main track, the train, with the appellee on the front car, was thrown from the main track upon the side-track, and it violently collided with the fifteen cars standing thereon, with such force as to crush the car on which he was standing and to break in two the car immediately following it, and if appellee had remained on the box-car he would have been in great danger of being fatally injured, and he so believed at the time; that from the time he first observed that the switch had been so thrown to the time of the collision, the only means he had of getting from the box-car, or of escaping from the threatened danger, was to jump from the top of the car to the ground, and he could not have remained on top of the car when the collision occurred; that he believed at the time that the only way to escape from the threatened danger to his life was to jump from the car, and acting upon that belief, when the box-car was within five or ten feet of the cars on the side-track, while the train was moving at said high speed, he jumped from the top of the box-car to the frozen ground on the side of the

track, and by reason thereof both of his ankles and the bones thereof were broken off at the ankle joint, etc., the nature and extent of his injury and expenses being stated; that the injury was the direct and proximate result of the negligence of the appellant, as above set out, in so maintaining said switch, side-track, moving panel and switching device in the manner above set out, and said negligence was the proximate cause of the injury, etc., stating the amount in which he had been damaged, and demanding judgment therefor.

1. The theory on which the pleader intended to proceed is not as manifest as seems desirable. For application of the closing averments respecting negligence, it is necessary to revert to the former averments, where we find the condition of the switching appliances fully described and characterized as negligently so maintained. The cause of the injury was the unsignalled open switch, with the stationary cars standing on the side-track, and the rapid speed of the train on which the appellee was employed. It is not alleged that the appellant caused the switch to be opened or left open, or had any knowledge or notice of its being open, or that it was open because of the want of a lock, target or signal-light; nor is any negligence attributed because of the presence of the freight-cars upon the side-track, or because of the speed of the train. It is not shown that if there had been a lock or a target or a signal-light the moving panel would not have been in the dangerous position, nor does it appear that if there had been a lock or a target the appellee would have had knowledge therefrom of the dangerous position of the moving panel. It is not alleged that the appellee did not know that the switching appliance was not provided with a lock or a target or a signal-light. It is alleged that by reason of the moving panel being set to the side-track, and not the main track, the train was thrown upon the side-track and violently collided with the cars standing thereon; and, if we except what is

said with reference to signal-lights, it is not shown that any or all the negligent acts or omissions alleged caused the existence of the conditions which brought about the injury. While it is not alleged that the appellee did not have knowledge of the general structure or condition of the switching appliances as described, it does appear that he did not know that the switch was open or that the moving panel was in a dangerous position. This dangerous condition he discovered too late, under the circumstances, to escape the injury caused thereby. And it is alleged that had the switch, moving panel or side-track been provided with signal-lights attached thereto in such a manner as to indicate danger when the switch was not set to the main track, the signal-lights could have been seen in time so that the train could have been stopped, or so checked as to have avoided a collision with the cars standing on the main track; and that from the time he first observed that the switch had been thrown to the time of the collision the only means of escape was to jump from the car. Thus it appears that the failure to provide the switching appliance with a signal-light is charged to have been an omission but for which the injury might have been averted, notwithstanding the condition otherwise of the switching appliances.

So, we are of the opinion that the complaint should be regarded as one proceeding, not as at common law, but under the statute of May 15, 1901 (Acts 1901, p. 160, §5173a *et seq.* Burns 1901). It is provided by section one of that statute: "That every steam railroad company operating wholly or partly in the State of Indiana, shall place and maintain upon each switch in said State that is connected with the main track a signal-light attached in such manner to the moving panel of such switch that it will indicate safety when such switch is set to such main track, and that it will indicate danger when such switch is not set to the main track. Said light shall be kept brightly burn-

ing constantly between the hours of sunset and sunrise, and on such days or parts of days as are dark and foggy." Section three (§5173c, *supra*), is as follows: "That for any violation of or failure to comply with any of the provisions of this act such company shall be liable to all persons and employes injured by reason thereof, and no employe shall in any case be held to have assumed the risk incurred by reason of such violation or failure."

2. The controlling matter agitated in the discussion of the evidence is the question whether the railroad designated in the complaint as the Belt Road was such a main track as is contemplated by this statute. The railroad designated on a plat introduced by the appellant as the "Semi-Belt" was situated about four miles from the railroad station of the appellant at the city of Marion, Grant county. It extended north and south two and one-half miles, between the main or trunk line of the Panhandle Company and that of the appellant, and it was owned and operated by both of these companies for their mutual benefit. It was used as a connecting or transfer track between the railroads of these companies, for the exchange or transfer of cars from one road to the other, and for reaching various manufacturing establishments not located on the trunk line of either of the companies, but situated in the vicinity of the Belt Road, and reached by switches and side-tracks connecting with it. Sometimes freight-trains and passenger-trains were run in upon it to permit the passing of other trains on the trunk lines, and sometimes, in case of a wreck on the road of either company, it was used for the passage of trains from the road of one company to and upon that of the other, in detouring for the purpose of avoiding the blockade so caused, but no regular passenger or freight-trains were run over it on schedule time. Cars were sometimes stored on it near its ends, for a short time, in cases of emergency. There were no depots or telegraph stations on the Belt Road. It

and its side-tracks were maintained by a separate section crew, which had no business on the trunk lines of the companies. Among the uses of the side-tracks connected with the Belt Road was the storage of cars, and the main track of the Belt Road was kept open by the companies, except in cases of emergency. Trains upon the Belt Road were not subject to the orders of the train despatchers of the companies by whom the traffic on the trunk lines was regulated. The yard crews worked only in daytime, and sometimes at night a regular train of the Panhandle Company would run from its road over the Belt Road to deliver cars, and sometimes at night an engine of the appellant with cars attached, to be delivered to connecting lines, would run on the Belt Road. There was telephone connection by means of which the division superintendent had communicated with a witness engaged at the Belt Road. The Belt Road was not kept up to the same standard as the main or trunk line of the appellant. There were four switches connecting as many side-tracks with the Belt Road. The first one north of the appellant's trunk line was known as the "south switch," and was used by the Panhandle Company for storing cars. The switching crews of the appellant had no business on this side-track, but delivered their cars to the Panhandle Company on a side-track farther north, known as the "old rolling-mill switch." At the time of the appellee's injury, the switches leading from the main or trunk lines of the appellant and the Panhandle Company to the Belt Road were equipped with targets, locks and switch lights, but those leading from the Belt Road to its four side-tracks, including the "south switch," were not so equipped. The appellee was an experienced railroad employe. When injured, February 1, 1902, he had been in the employ of the appellant ten days, working in the Marion yards and over the belt track. Some years before he had worked for the Panhandle Company with switching crews on the belt track, at which time none of the switches leading therefrom

to the four side-tracks had targets, locks or lights, and they were still in the same condition as when he had worked for the Panhandle Company. When injured he was employed as a brakeman or switchman in the appellant's crew, consisting of a conductor, an engineer, a fireman and two brakemen. He and the other members of the crew were engaged in transferring eight freight-cars from the main line of the appellant northward over the Belt Road to the second side-track, in front of the engine by which they were moved. The train was in charge of the conductor, who gave orders to the other members of the crew, directing what they should do. The speed of the train was regulated by the engineer. The appellee was standing upon the top of the forward car, a large refrigerator box-car, the one farthest from the engine. The cars were to be stored on the second side-track, to reach which the train would pass the "south switch." The train was moving at the rate of eighteen or twenty miles an hour. It was the duty of the appellee to give signals to the engineer, if there were obstructions on the track. It was a dark and gloomy day, and it was snowing—fine snow falling fast. When within thirty-five feet of the "south switch" he observed that it was open, or set for running upon the side-track, upon which a number of cars were standing. As quickly as he could do so, he signalled the engineer to stop. The signal was not obeyed, but the train could not then have been prevented from running upon the side-track and against the cars standing thereon. When the car on which he was standing was within six feet of the stationary cars he jumped to the ground to save himself, and received the injury for which he sought damages. No lights or signals of any kind were at the open switch, and he had no means of ascertaining whether it was open or closed, except the ends of the rails or the lever which was lying close to the ground between the ties, which indications could be seen only at a short distance.

Within comparatively recent years, accompanying the great development of commerce and the increasing number of manufacturing industries, and the multiplying of lines of railways extending through the country and connecting its cities and towns with each other, there have been constructed, in or near many prospering cities, at which two or more through lines touch, other and local railways, often, if not commonly, known as belt railroads, which furnish convenient means of transfer from one through line to another or others, and also furnish opportunity for the location of manufacturing establishments needing railway facilities, and making it convenient for them to exist in the neighborhood of such cities without bordering upon such through lines of railway. Sometimes such belt railroads are constructed and maintained by independent corporations, wholly distinct as to ownership from the through lines connected therewith. In the case before us, the Belt Road is owned and operated by the two railroad companies which separately own and operate the two through lines connected by it. It is not a part of one of such through lines more than of the other. It is under ownership different from that of either of the two through lines, and is maintained by a distinct set of employes. Its main track can not be said to be merely a part of the main track of either of the companies considered separately, yet it is a steam railroad having a main track and side-tracks connected with it by switches. As to each of the companies separately considered, it serves as a branch railroad leading to the railroad of another company. It is not merely a track in a switch yard of a railroad company. With reference to such side-tracks and switches along the Belt Road, the track with which they all connect is the main track.

3. One of the purposes of the statute in question is plainly indicated by its language to be the protection of railroad employes, using the main track, from injury through want of notice of the condition for the time being

of the switches connecting side-tracks. Looking to the character and uses of the belt road here involved, and the circumstances of the appellee's injury, we can not but regard the main track of the Belt Road as included in the broad meaning necessarily attributable in order to accomplish the remedial purpose of the statute.

We see nothing on which to base a serious question in this court as to contributory negligence.

Judgment affirmed.